IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

DJRJ, LLC, DJRJ CORPORATE, LLC, )
and, DJRJ ENTERPRISES, LLC, )
                                            Plaintiffs, )
                                            )
v. )    Case No. 16-CV-21-GKF-FHM
                                            )
U-SWIRL, INC., and, ROCKY MOUNTAIN )
CHOCOLATE FACTORY, INC., )
                                            )
                         Defendants. )

## OPINION AND ORDER

Before the court are the Motions for Summary Judgment of defendant U-Swirl, Inc. [Doc. No. 90] and defendant Rocky Mountain Chocolate Factory, Inc. [Doc. No. 89]. For the reasons set forth below, the motions are granted.

### I. Factual Background

By Asset Purchase Agreement ("APA") dated January 17, 2014, U-Swirl acquired franchising, licensing, and other assets of various CherryBerry entities[1]—a group operating frozen yogurt stores across the country. [Doc. No. 90-1]. In exchange for the assets, U-Swirl paid $4.25 million and 4 million shares of common stock, which were subsequently assigned to CherryBerry's principals, Dallas and Robyn Jones. [*Id.* at 3]. Those shares were subject to a lockup provision—Section 3.6(a) of the APA—which prevented their sale for one (1) year. [*Id.* at 5]. After that, shares could be sold subject to: (1) a buyback option held by U-Swirl and its parent company, Rocky Mountain, and (2) a trading volume limitation. [*Id.*]. That limitation

---

[1] The CherryBerry entities—collectively, the plaintiffs in this action—include CherryBerry LLC, n/k/a DJRJ, LLC, CherryBerry Corporate, LLC, n/k/a DJRJ Corporate, LLC, and CherryBerry Enterprises, LLC, n/k/a DJRJ Enterprises, LLC. For convenience, the court refers to plaintiffs as "CherryBerry."

prohibited any sale of shares in excess of the average daily trading volume of U-Swirl stock for the preceding 30 days. [*Id.*].

The APA also provides for a "Shortfall Payment." [*Id.*]. Specifically, Section 3.6(b) obligates U-Swirl to pay the difference between a proposed share price and $.50 for the number of shares sold. [*Id.*]. In other words, U-Swirl guaranteed a $.50 minimum return on any proper sale of its stock. [*Id.*]. Payment was due within 10 days of receipt of a proof of sale. [*Id.*]. This dispute arises from the Joneses' sale of U-Swirl stock and the alleged non-payment of the Shortfall Payment described in Section 3.6(b) of the APA.

Between July and August 2015, the Joneses sold 518,476 shares of U-Swirl common stock at prices ranging from $.252 to $.0727 per share. [Doc. No. 58, p. 4, ¶ 13]; [Doc. No. 90, p. 2, ¶ 5]. As a result, they demanded a contractual Shortfall Payment in the amount of $204,725.46. [Doc. No. 58, p. 4, ¶ 13]. U-Swirl denied payment. And it did so on grounds that the Joneses' sales exceeded the average daily trading volume for the previous 30 days. This suit followed. On January 13, 2016, CherryBerry sued U-Swirl for breach of contract; it also sought declaratory judgment against U-Swirl and Rocky Mountain for veil-piercing and recharacterization of certain debt as equity. CherryBerry filed an Amended Complaint on May 19, 2016, alleging the same causes of action. U-Swirl and Rocky Mountain now move for summary judgment.

## II. Legal Standard

Summary judgment shall be granted if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a rational trier of fact to resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 670 (10th Cir. 1998). A fact is "material" if it is essential

to the outcome of the case. *Id.* On review, a court must examine the record in the light most favorable to the non-movant. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 7983, 796 (10th Cir. 1995). But in a contract dispute, "if [ ] contractual language is unambiguous," "[s]ummary judgment . . . should be granted." *See Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014).

### III. Analysis

Colorado law governs the APA. [Doc. No. 90-1, p. 30]. And in Colorado, courts "enforce unambiguous [contracts] in accordance with their terms." *McShane v. Stirling Ranch Prop. Owners Ass'n, Inc.*, 393 P.3d 978, 982 (Colo. 2017); *see also LPG Holdings, Inc. v. Casino Am., Inc.*, 232 F.3d 901 (Table) (10th Cir. 2000) (unpublished). To that end, where payment depends upon a condition precedent, a failure of that condition defeats any contractual claim. *See Dinnerware Plus Holdings, Inc. v. Silverthorne Factory Stores, LLC*, 128 P.3d 245, 247–48 (Colo. App. 2004); *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058–59 (Colo. 1992); *cf. Maranville v. Utah Valley Univ.*, 568 F. App'x 571, 576 (10th Cir. 2014) (applying Utah law). That is especially appropriate when the condition is within the claimant's control. *See Dinnerware*, 128 P.3d at 24 (citing Restatement (Second) of Contracts § 227(1) (1981)). Here, the Shortfall Payment is conditioned on the Joneses' compliance with the trading volume limitation.

*First*, the Shortfall Payment applies only to sales authorized by the APA. By its plain terms, Section 3.6(b) calculates such payment in terms of sales "pursuant to Section 3.6(a)." [Doc. 91-1, p. 5]. Put differently, recovery is conditioned on conformity to that provision. *See, e.g., Qwest Corp. v. Pub. Util. Comm'n of Colo.*, No. 04-D-2596-WYD-MJW, 2006 WL 771223, at *4 (D. Colo. Mar. 24, 2006) (explaining the phrase "pursuant to" incorporates "the general and

3

specific duties set forth" in a cross-referenced provision); *Edgington v. R.G. Dickinson & Co.*, 139 F.R.D. 183, 189 n.4 (D. Kan. 1991) ("'Pursuant to' is typically used to connote some nexus between an action and a point of reference."); Black's Law Dictionary 1272 (8th ed. 2004) (defining "pursuant to" as "[i]n compliance with; in accordance with"). Thus, a claimant seeking a Shortfall Payment must comply with all material terms and conditions of Section 3.6(a), including limitations on sales. *See* [Doc. 91-1, p. 5].

Trading volume is such a limitation. Indeed, Section 3.6(a) expressly qualifies any sale of stock as follows: "*provided* that [the Joneses] may not sell more shares of [U-Swirl's] [c]ommon [s]tock on any day than the average daily trading volume for [that stock] . . . over the previous thirty (30) days." [Doc. No. 91-1, p. 5] (emphasis in original). The APA's use of the term "provided" is instructive; that word generally creates a condition precedent. *See Dinnerware*, 128 P.3d at 247–48 (collecting cases); Black's Law Dictionary 1261 (8th ed. 2004) (defining "provided" as "[o]n the condition or understanding that"). Thus, any sale of U-Swirl stock—and by extension entitlement to a Shortfall Payment—depend upon adherence to the trading volume limitation set out in Section 3.6(a).

*Second*, the Joneses violated that limitation. In their briefs, all parties assume trading volume is calculated on a "rolling" basis—that is, on the days immediately preceding a sale. *See* [Doc. No. 90, p. 3]. The court disagrees. Best read, the contract requires a fixed, block construction of the window used to calculate trading volume. The APA's text supports that conclusion. Section 3.6(a) permits sales "over the [ ] thirty (30) days" after U-Swirl and Rock Mountain decline to exercise their buyback option. [Doc. No. 90-1, p. 5]. That stands in contrast to "the previous thirty (30) days" used to define U-Swirl's "average daily trading volume." *See* [*id.*]. Section 3.6(a)'s use of the phrase "thirty (30) day period" confirms that

4

construction.  *See* [*id.*].  Indeed, the APA provides that if the Joneses "ha[ve] not sold all" of their shares in the 30 day "period" after the buyback option expires, Section 3.6(a) resets, and "again appl[ies]" to subsequent sales of U-Swirl stock.  *See* [*id.*].

To summarize: after expiration of U-Swirl and Rocky Mountain's buyback option, a 30-day window opens in which the Joneses may sell their shares; no such sale, however, may exceed the fixed, pre-option volume limitation; that volume is calculated based on the month preceding non-exercise of the APA buyback option, not the date of a sale; and the limitation governs the entire sale period; in the event the Joneses have not sold all of their U-Swirl stock within that period, Section 3.6(a) resets, and its procedures apply to subsequent efforts to sell U-Swirl stock.

The use of the phrase "on any day" does not change the result.  [Doc. 90-1, p. 5].  To be sure, the APA prohibits the sale—"on any day"—of shares in excess of the "average daily trading volume. . . over the previous thirty (30) days."  [*Id.*].  But that refers to sales "on any day" of the month-long sale window, none of which can exceed the average 30-day trading volume before the window opened.  *See* [*id.*].  Other textual indicators support this reading, *supra*, at 3–5; *infra*, at 6–7, and nothing else in the APA undermines the conclusion that trading volume is calculated for the month preceding non-exercise of the buyback option, and not the date of sale.

This construction makes functional sense as well.  A contract will not be interpreted to defeat the intention of the parties.  *See, e.g.*, *Cloudpath Networks, Inc. v. SecureW2 B.V.*, 157 F.Supp.3d 961, 969 (D. Colo. 2016); *Hutchinson v. Elder*, 344 P.2d 1090, 1092 (Colo. 1959); *Jewel Tea Co. v. Watkins*, 145 P. 719, 721 (Colo. App. 1915).  And here, the manifest purpose of the volume limitation was to prevent the Joneses from flooding the market with U-Swirl stock in

order to capture the financial upside of the Shortfall Payment. That is the very result a rolling window would produce. By dumping stock *en masse*, CherryBerry could artificially inflate trading volume one day, and take advantage of it the next. And that may have happened in this case. Based on U-Swirl's trading activity, the initial maximum trading volume—8,080 shares per day—almost tripled in just 3 weeks to 23,660. [Doc. No. 90, p. 3]; [Doc. No. 91]; [Doc. No. 91-1].

Indeed, uncontroverted testimony establishes that the Joneses traded U-Swirl stock at high volumes in order to take advantage of the Shortfall Payment in this case: former U-Swirl CEO Rico Conte testified that, after U-Swirl and Rocky Mountain declined to exercise their buyback option, the Joneses stated "they d[idn't] know what to do with [the stock], so [they] we[re] going to sell it" since "[they]'ve got the guarantee," [Doc. No. 90-4, p. 2]; CherryBerry's co-owner, Dallas Jones, offered similar testimony, explaining that in order "to get the money that [he] felt was owed," he "didn't care what [the stock] was at or how [he] sold it," because of "the back-stop" [Doc. No. 90-3, pp. 265–66]; and though he "knew [he] had to follow the rules," [*id.* at 266], he also authorized his broker to trade U-Swirl stock in a maximum risk, speculation category, [*id.* at 283–84]; and Mr. Jones confirmed that he never wanted U-Swirl stock as a form of consideration in the first place, [*id.* at 154] ("[Q.] [Y]ou didn't want stock to be part of the consideration, you wanted it to be all cash? A. Absolutely."); [*id.* at 155] ("I just wanted cash. Why would you want stock? . . . U-Swirl was a penny stock, and I wasn't a complete idiot . . . [I]f I was going to sell, I wanted cash. I didn't want to have to wait.").

A rolling construction is also broadly inconsistent with U-Swirl and Rocky Mountain's buyback option. Section 3.6(a) fixes the buyback price at the high-low average price of U-Swirl stock for the 20 trading days "immediately preceding" any tender by the Joneses. [Doc. No. 90-

6

1, p. 5]. In light of that fact, it would be inconsistent for the APA to calculate the buyback price over fixed date range, but volume on a rolling basis. Moreover, as described above, the ability to artificially inflate trading volume—and by extension share price—would distort the buyback option in the future, after expiration of a given 30-day sale period. As a result, U-Swirl and Rocky Mountain would be forced to choose between two bitter cups: repurchase worthless stock or pay a $.50 minimum on an artificially bloated trade volume. Nothing in the APA forces such a choice.

Thus, under any reading of the contract, the Joneses violated the volume limitation. Under a block construction, all of the Joneses' trades exceed the 8,080 share-per-day limit in effect from July 21, 2015, to August 21, 2015. [Doc. No. 90, p. 3]; [Doc. No. 91]; [Doc. No. 91-1]. And even under a rolling construction—whether measured in trading days or calendar days—the Joneses materially breached Section 3.6(a). [Doc. No. 90, p. 3]; [Doc. No. 91]; [Doc. No. 91-1]. The only question remaining with respect to the volume limitation is whether the Joneses articulate a colorable reading of Section 3.6(a) that authorizes their trades. Put simply, they do not.

The Joneses argue that trading volume should be calculated based on the number of "trading days" in a given 30-day period. [Doc. No. 103, pp. 3–4]. But that is not what the contract says, and courts "[should] not rewrite or amend contractual provisions that are clear and unambiguous." *See Engineered Data Products, Inc. v. Nova Office Furniture, Inc.*, 849 F.Supp. 1412, 1417 (D. Colo. 1994). Aside from Mr. Jones' say-so [Doc. No. 103-1], nothing suggests the phrase "thirty (30) days" in Section 3.6(a) means a lesser number of trading days within a 30-day window. *See, e.g.*, [Doc. No. 90-1, p. 5]; [Doc. No. 103-1, p. 13] ("As I understand it, if RMCF does not elect to [p]urchase all or any of the SWRL shares from the Jones[es], they can

start [s]elling shares, and are limited to selling no more than the average daily volume [o]f the previous 30 days."). And the Joneses' interpretation is unusual for how it calculates the volume limitation: it measures the number of shares sold (the numerator) in terms of 30 calendar days, but divides it by a lesser number of trading days within that 30-day window. *See* [Doc. No. 103, p. 4] ("On a daily basis, the average daily volume was calculated on the basis of the total sum of shares sold within the preceding thirty (30) calendar days, divided by the number of trading days within each day's preceding thirty (30) calendar-day period."). No evidence establishes that construction as the prevailing view of Section 3.6(a) when the APA was executed, rather than a *post hoc* litigation position. And in practice, the Joneses' reading inflates the maximum trading volume allowed under the APA by its use of a variable, artificially depressed denominator. [Doc. No. 112, pp. 2–3]. As used in the APA, "thirty (30)" means thirty (30), whether measured in calendar days or trading days. Based on the foregoing, the Joneses not only failed to establish a condition precedent to the Shortfall Payment, but materially breached the APA.

"Under Colorado law, a material breach of contract excuses the other party's performance." *See Elec. Distrib., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1086 (10th Cir. 1999). "Materiality depends on many factors, including whether the venture made sense absent the condition, whether it can survive the breach, and whether the possibility of cure exists." *See Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1502 (10th Cir. 1994) (internal citations omitted).

The Joneses' trades—separately and together—constitute a material breach of the APA. To start, all parties characterize violations of Section 3.6 as a material breach. [Doc. 58, p. 4, ¶ 15] (describing U-Swirl's failure to issue the Shortfall Payment as a "material breach," which "excuses . . . further performance with . . . Section 3.6"); [Doc. No. 90, pp. 5–6] (describing the

8

Joneses' failure to comply with APA volume limitations as a material breach of the APA). And as described above, the Joneses: (1) violated Section 3.6(a)'s volume limitation; (2) inflated the amount of U-Swirl stock on the market, allowing them to take advantage of increased volume for sales going forward; and (3) thwarted the utility of U-Swirl and Rocky Mountain's buyback option by manipulating market volume and price. For these reasons, U-Swirl is entitled to summary judgment on CherryBerry's contract claim.

*Third*, CherryBerry's remaining claims are dismissed for lack of standing. Under Article III of the Constitution, standing is dispensed claim-by-claim, not in gross. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006). And here, CherryBerry's claims against Rocky Mountain are derivative—that is, dependent on a finding that U-Swirl breached the APA. Having concluded U-Swirl did not breach the Agreement, "there is nothing left for the [c]ourt to declare with respect to" Rocky Mountain's alter ego liability or equity interest in U-Swirl. *See Unit Petroleum Co. v. Frost*, No. 11-cv-627-JED-FHM, 2014 WL 585361, at *8 (N.D. Okla. Feb. 13, 2014); *see also Boydston v. N.M. Tax. & Rev. Dep't*, 125 F.3d 861 (Table), at *3, n.1 (10th Cir. 1997) (unpublished) ("Plaintiffs' declaratory judgment claim is moot in light of the construction of the contracts determining that they did not have a constitutional property interest and that the contracts could be terminated without cause."). Declaratory relief on those matters "would not affect[ ] the behavior" of U-Swirl or Rocky Mountain towards CherryBerry, and as such, is unnecessary. *See Schell v. OXY USA Inc.*, 814 F.3d 1107, 1116 (10th Cir. 2016), *cert. denied*, 137 S.Ct. 376 (2016) and 137 S.Ct. 446 (2016). In other words, the requested declarations "would have no effect in the real world and [would] essentially be an advisory opinion." *See Un. Sch. Dist. No. 259, Sedgwick Cty., Kan. v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1150 (10th Cir. 2007) (internal quotation marks and citations omitted). Because

advisory opinions are forbidden by Article III, CherryBerry's non-contract claims are dismissed. *See id.* at 1146–47.[2]

WHEREFORE, U-Swirl's Motion for Summary Judgment [Doc. No. 90] is granted, and Rocky Mountain's Motion for Summary Judgment [Doc. No. 89] is granted on grounds of standing.

IT IS SO ORDERED this 11th day of July, 2017.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[2] Even if Article III did not bar adjudication of CherryBerry's non-contract claims, the court would decline to do so as an exercise of its discretion to refrain from issuing declaratory judgments. *See Frost*, 2014 WL 585361, at *8.